NOT DESIGNATED FOR PUBLICATION

No. 117,331

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption of P.N.S.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Finney District Court; WENDEL W. WURST, judge. Opinion filed September 15, 2017. Affirmed.

*Margaret M. Schultz*, of Schultz Law Office, P.A., of Garden City, for appellant natural father.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, for appellee stepfather.

Before GREEN, P.J., BUSER and LEBEN, JJ.

PER CURIAM: This is an appeal of the district court's order granting a stepparent adoption. P.N.S., who was born on February 27, 2012, is the biological daughter of A.M.D. (Mother) and A.W.S. (Father). Father claims there was insufficient substantial competent evidence to support the district court's order allowing C.M.D. (Stepfather) to adopt P.N.S. Based upon our review of the appellate briefs, the district court's order, and the record on appeal, we are persuaded there was substantial competent evidence to support the district court's order. Accordingly, we affirm the district court's judgment ordering the adoption of P.N.S. by Stepfather.

FACTUAL AND PROCEDURAL BACKGROUND

In the summer of 2011, Father was incarcerated in the Finney County jail for the misdemeanor crime of obstruction of official duty. While he was incarcerated, Mother

1

informed Father that she was pregnant with his child. P.N.S. was born on February 27, 2012, while Father was incarcerated.

After his release from jail in June 2012, Father lived with Mother and P.N.S. at the home of Mother's parents, R.L. (Grandfather) and C.L. (Grandmother) (together Grandparents). Father moved from the home, however, about 5 months later, in November or December 2012, and returned to his parents' residence. In early 2013, Mother and P.N.S. moved in with Father and his parents for several weeks, but returned to Grandparents' home shortly thereafter. After that time, until Father's arrest in September 2013, Father saw P.N.S. outside Grandparents' home several times a week for "five or ten minutes."

Father was arrested again in January 2014, and sentenced to consecutive prison terms of 67 months and 12 months for possession of methamphetamine with the intent to distribute and criminal threat against Mother. At the time of the adoption trial, Father remained in prison with his earliest release date set for October 18, 2018.

Mother and P.N.S. continued to live with Grandparents until the summer of 2014, when they moved in with Stepfather whom Mother had been dating throughout the spring. Mother did not provide Father with her new address or phone number and did not initiate any contact with him. Mother and Stepfather married in the summer of 2015.

On May 3, 2016, Stepfather filed a petition to adopt P.N.S., and Mother filed a pleading consenting to the adoption. Father, however, did not consent to the adoption and on August 31, 2016, the district court held a trial on the matter. At trial, there were numerous witnesses who testified about Father's financial support and the nature of his parental relationship with P.N.S. during the two years preceeding Stepfather's filing his petition for adoption. These witnesses included Stepfather, Mother, Grandparents, Father, R.G., his sister, and P.S., his mother. This testimony will be summarized below as we

2

address Father's complaint that the trial evidence was insufficient to warrant the district court's order for adoption.

After considering the evidence, the district court issued a lengthy and detailed decree of adoption summarizing the relevant law pertaining to stepparent adoptions, discussing the material facts of the case, and making conclusions of law. The district court granted Stepfather's petition for adoption, ruling: "The Court rejects [Father's] testimony to the contrary and finds that the evidence clearly and convincingly establishes that he has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition for adoption." Upon this finding, the district court held that Father's consent to the adoption was not necessary under K.S.A. 59-2136(d).

Father filed this timely appeal.

SUFFICIENCY OF EVIDENCE

On appeal, Father challenges the district court's determination that he failed to assume his duties as a parent for the two years preceding the filing of the petition for adoption, and he contends the district court's findings were not supported by substantial competent evidence. In particular, Father claims that especially given his incarcerated status, he provided sufficient financial support, communication, love, and affection for P.N.S. Father also contests the district court's finding that his contacts with P.N.S. were incidental, and he asserts the court disregarded evidence that Mother hindered Father's relationship with P.N.S. In response, Stepfather reprises the evidence presented at trial which supports the district court's factual findings and order of adoption.

3

*Standard of Review and Summary of Relevant Law*

We begin with a statement of our standard of review. Whether a nonconsenting parent has failed or refused to assume parental duties is a question of fact which appellate courts review to determine if it was supported by substantial competent evidence. Our court reviews the facts of a case "in the light most favorable to the prevailing party below" and will not reweigh the evidence or pass on the credibility of witnesses. *In re Adoption of J.M.D.*, 293 Kan. 153, 171, 260 P.3d 1196 (2011).

K.S.A. 2016 Supp. 59-2136(d) governs stepparent adoptions, and provides that such an adoption may proceed if:  (1) both natural parents consent to the adoption, or (2) the district court determines consent is not required from any nonconsenting parent because the nonconsenting parent "has failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition for adoption or is incapable of giving such consent."

Once a court determines the nonconsenting parent has failed or refused to assume his or her parental duties, it may further "consider the best interests of the child and the fitness of the nonconsenting parent in determining whether a stepparent adoption should be granted." K.S.A. 2016 Supp. 59-2136(d). Granting an adoption under this section terminates the nonconsenting parent's parental rights. K.S.A. 2016 Supp. 59-2136(i).

There are additional rules that apply in cases—like this one—where the nonconsenting parent is incarcerated. When considering whether an incarcerated parent has failed to assume his or her parental duties, a district court should consider all of the surrounding circumstances. *In re Adoption of J.M.D.*, 293 Kan. at 167. Our Supreme Court has also recognized that an incarcerated parent has significant limitations on the way in which the parent can carry out parental duties; and thus, courts must decide whether the incarcerated parent has pursued the available opportunities to the best of that

4

parent's ability. *In re Adoption of S.E.B.*, 257 Kan. 266, 273, 891 P.2d 440 (1995); *In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987). Importantly, "the parent [must have] made reasonable attempts, under all the circumstances, to maintain a close relationship with his or her child." *In re Adoption of A.J.P.*, 24 Kan. App. 2d 891, 893, 953 P.2d 1387 (1998); *In re K.R.D.*, No. 114,251, 2016 WL 758759, at *4 (Kan. App. 2016) (unpublished opinion).

*Providing Financial Support*

Father takes issue with the district court's finding that "[d]uring the first year and one-half of her life, [P.N.S.] received little financial support from her father." Father counters that he spent the first few months of P.N.S.' life in jail and that upon his release he provided "diapers, clothes, whatever P.N.S. needed." Given that Father was incarcerated during most of the relevant two-year period prior to the filing of Stepfather's petition, he claims the district court erred in "partially" relying on his inability to provide financial support in granting Stepfather's adoption request.

In response, Stepfather argues that the district court "did not consider the financial shortcomings of [Father] in its ultimate ruling." On the contrary, the "district court specifically found that it could not rely on the lack of financial contributions in assessing the assumption of the role of a parent."

Kansas courts have recognized that, during an incarceration, a parent may have little money to contribute or send to his or her child for the child's support. In those circumstances, courts may *not* consider the lack of financial support as a failure or refusal to assume parental duties. See *In re Adoption of S.E.B.*, 257 Kan. at 274; *In re Adoption of F.R.-H.*, No. 114,391, 2016 WL 1732874, *4 (Kan. App. 2016) (unpublished opinion).

5

The trial evidence showed that Father failed to financially support P.N.S. prior to his incarceration in January 2014. Father's mother estimated that Father spent a total of $50 on P.N.S. before his arrest. Father sought to controvert this testimony, but his mother acknowledged there was no evidence that he paid for the "diapers, clothes . . . food, [and] milk" that Father claimed to have purchased for P.N.S.

We agree with Stepfather that Father's nonsupport of P.N.S. while incarcerated during most of the two years preceding the filing of the petition for adoption did not provide any part of the district court's rationale for ordering the decree of adoption. In the order, the district court specifically cited:  "Our courts have recognized that during an incarceration, a parent may have very little money to contribute or to send to the children for their support. . . . When that happens, the lack of support may not be considered as a failure or refusal to assume parental duties. [Citation omitted.]" *In re Adoption of F.R. – H*, 2016 WL 1732874 at *4. Moreover, Father's lack of financial support was not mentioned as a reason for the district court's order. We find no error.

*Failing or Refusing to Assume Other Parental Duties*

Next, Father contends that, given his incarceration, he took advantage of whatever opportunities were available to maintain a parental relationship with P.N.S. In particular, Father notes that he sent letters and cards to P.N.S. at Grandparents' address "on at least a monthly, or every other month, basis with no response." According to Father, this was the only reasonable means of maintaining his parental relationship with P.N.S. because after Mother moved from Grandparents' home she failed to provide him with her new address. Stepfather counters that, at most, Father's contacts with P.N.S. were incidental and, therefore, did not constitute a reasonable means to maintain a parental relationship.

The district court focused its adoption decision on Father's lack of parental contacts with P.N.S. and found:

6

"22. The Court further concludes that if [Father's] testimony that he 'sent letters every other month, probably for a while' and 'sent a card every birthday, every Christmas,' were true, such efforts would have constituted nothing more than incidental visitations, contacts, communications or contributions which the Court would disregard . . . .

"23. . . . While incarceration limits or precludes the ability to financially support a child and to personally interact and parent a child, it does not take away the number of hours per day and days per week a parent can devote to efforts to contact and maintain a continuing relationship with his child. It does not preclude an incarcerated parent from writing his child daily, it does not preclude an incarcerated parent from requesting family members residing in the same town as the child, her mother and her grandparents to contact them to arrange for regular communications between the father and child; and it does not preclude an incarcerated parent from making reasonable efforts to establish phone communications with the child. The evidence clearly and convincingly establishes that [Father] did none of those things and that his failure to do so was not due to hindrance or interference from [Mother]. The evidence clearly and convincingly establishes [Father] did not take advantage of available opportunities to perform parental duties to the best of his ability and that his virtually non-existent effort to contact and maintain a continuing relationship with [P.N.S.] was not reasonable nor sufficient."

A brief summary of the trial testimony is helpful to an understanding of the factual basis for the district court's findings and legal conclusions. At trial, Mother testified that after she and P.N.S. moved back to Grandparents' home, Father "would stop by . . . randomly . . . [a]bout twice a week . . . for about five to ten minutes" to hold P.N.S. and bring her breakfast. Father said he never ventured inside the home, explaining, "I wasn't allowed to come inside. I was made to stay outside with my daughter." Grandmother disputed this testimony, however, and claimed that Father was welcome in her home.

After Father's arrest in January 2014, Mother stated there was no direct contact between him and P.N.S. for nearly two-and-a-half years. According to Mother, P.N.S. received no correspondence from Father during this period except for "two cards and a letter" postmarked August 12, 2016—about two weeks prior to the trial. In these cards,

7

Father told P.N.S., "[h]e wanted her to set up phone calls and email him . . . [and also] to send pictures to him and call." Stepfather corroborated this testimony. Both Grandparents claimed they never received gifts, letters, or other correspondence addressed to P.N.S. from Father while he was incarcerated.

On the other hand, Father testified that he "sent stuff to [G]randparents' house . . . with never no response [*sic*]." In particular, Father claimed that "[t]he first year I sent letters every other month probably for a while. I sent a card every birthday, every Christmas."

Father's sister testified that although he mentioned sending occasional cards or letters to P.N.S., she acknowledged never seeing any correspondence. Father's sister also said that although she knew Grandparents, she never inquired about Mother's new address and never helped Father communicate with P.N.S. because he never asked for her assistance. Father corroborated his sister's testimony when he testified, that he had "tried to get in contact [with P.N.S.] the only way [he] knew how without going out and having somebody try to contact [Mother] and go that route."

As summarized, there was substantial competent evidence contrary to Father's testimony that he sent occasional correspondence to P.N.S. during his incarceration. In considering this matter, the district court specifically rejected Father's testimony while giving credit to the testimony of witnesses who disputed Father's claim of limited contacts. Nevertheless, the district court also found that if Father's testimony was true, "such efforts would have constituted nothing more than incidental visitations, contacts, communications or contributions which the Court would disregard."

On appeal, Father challenges the district court's characterization of his contacts as merely incidental. He argues that "[t]hese letters and cards were the only reasonable avenue for [Father] to get in contact with P.N.S. An incarcerated parent does not have the

means available to him to research possible addresses or learn from word of mouth where P.N.S. would be living." Stepfather counters:

> "Even by [Father's] own non-credible testimony, after 'probably for a while,' he cut his own contacts with PNS to twice a year with a birthday card and a Christmas card. No court has ever found that sending a card twice a year fits within the definition of being a reasonable attempt to maintain a close relationship with the child."

Kansas law provides that in adoption proceedings a "court may disregard incidental visitations, contacts, communications or contributions." K.S.A. 2016 Supp. 59-2136(d). Kansas courts have defined "'incidental'" as "'casual, of minor importance, insignificant, and of little consequence.' [Citations omitted.]" *In re Adoption of S.J.R.*, 37 Kan. App. 2d 28, 42, 149 P.3d 12 (2006); *In re Curtis N.*, No. 112,702, 2015 WL 1947464 (Kan. App. 2015) (unpublished opinion).

We find no error in the district court's determination that, if true, Father's contacts with P.N.S. during the relevant period were incidental. The correspondence was limited in number, and there was no testimony that Father attempted to communicate with P.N.S. by other means, such as by phone or internet. Moreover, Father specifically chose not to have family members or friends personally contact Mother in order to arrange more frequent and substantive contacts. Given the trial evidence, we are convinced that Father's contacts with P.N.S. were merely incidental.

On a related issue, Father argues that Mother "actively hindered and interfered with" Father's ability to have a relationship with P.N.S. Father notes Mother's testimony that she "took no proactive steps to encourage the relationship prior to [Father] being incarcerated." After his incarceration, Father complains that Mother never provided him with her new address when she moved in August 2014. On the other hand, Stepfather suggests that during the first six months of Father's incarceration, Mother and P.N.S.

9

were living with Grandparents yet no cards or letters were received during this time period when Father knew where P.N.S. was residing. Additionally, Stepfather asserts that any lack of contact was not necessarily due to Mother's hindrance but could be related to the fact that Mother was the victim of a criminal threat by Father.

Kansas courts have determined that "evidence indicating the consenting parent interfered with a [nonconsenting] natural parent's rights to maintain contact with their child can be considered when determining whether a parent has failed to assume his or her parental duties." *In re Adoption of N.I.E.*, No. 109,820, 2013 WL 6168673, at *4 (Kan. App. 2013) (unpublished opinion) (citing *In re Adoption of F.A.R.*, 242 Kan. 231); *In re Adoption of R.J.A.*, No. 100,723, 2009 WL 2030386, at *5 [Kan. App. 2009] [unpublished opinion]).

In this case, the district court considered the hindrance issue but concluded that Father's failure to make reasonable efforts to communicate with P.N.S. "was not due to hindrance or interference from [Mother]." We agree. While Mother could have done more to facilitate parental contacts, substantial evidence supports the district court's conclusion that her failure in this regard did not rise to the level of hindrance or interference. As discussed earlier, Father had several different avenues to pursue in maintaining a parenting relationship with P.N.S., yet he failed to take advantage of those opportunities. See *In re Adoption of S.J.R.*, 37 Kan. App. 2d at 44-45 (rejecting father's claim that mother interfered with his relationship with child when mother moved without providing a new address and noting that father exercised only minimal efforts to contact child while incarcerated).

Next, in support of his legal position, Father places much emphasis on *In re Adoption of K.R.D.*, 2016 WL 758759. That case shares few similarities with the present case on appeal, however. In *In re Adoption of K.R.D.*, the father and mother initially lived with father's parents in Texas before his arrest. Afterward, the mother and K.R.D.

10

regularly visited the father in prison, until the mother moved to Missouri and the father was transferred to a federal prison in Virginia. Even then, mother allowed K.R.D. to visit her grandparents, who would set up phone conversations between K.R.D. and the father. K.R.D. even visited her father in prison. This dynamic changed after the mother filed for divorce and moved to Kansas. After the move, the mother changed her phone number and blocked calls from the father—who then asked his parents to relay messages to mother asking that she allow K.R.D. to have contact with him. Although mother provided the grandparents with her new address, they agreed not to share it with father unless she gave permission. Father eventually emailed mother, but received no reply.

Reviewing these facts in *In re Adoption of K.R.D.*, our court found: "[T]he surrounding circumstances . . . do not support the conclusion that Father has failed or refused to assume parental duties for the relevant 2-year period." 2016 WL 758759, at *4. Our court concluded the stepparent adoption could not proceed because the biological father had not given his consent. 2016 WL 758759, at *6.

We question Father's claim on appeal that he "did exactly the same in this case" as the father in *In re Adoption of K.R.D*. Whereas the incarcerated father in *In re Adoption of K.R.D.* maintained regular, consistent, and purposeful contact with his child, Father's testimony regarding his contacts with P.N.S. pales by comparison. Unlike the father in *In re Adoption of K.R.D.*, who made sustained efforts to contact his child even after the mother moved and blocked his phone calls, there is no evidence in this case that Father made any effort to contact P.N.S. apart from possibly mailing an occasional letter. Rather than support Father's legal contentions, *In re Adoption of K.R.D.* demonstrates the sort of efforts an incarcerated parent might reasonably make to maintain a parenting relationship with his or her child and highlights the deficiencies in Father's efforts in this case.

Finally, we note that Father does not contest the district court's finding that Stepfather was sufficiently fit to parent P.N.S. and that P.N.S.'s best interests would be served by granting Stepfather's petition for adoption.

Upon our review, we are persuaded that in the light most favorable to Stepfather there was substantial competent evidence presented at trial to support the district court's factual findings and legal conclusions. In particular, the district court did not err when it found that Father "failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the petition for adoption." See K.S.A. 2016 Supp. 59-2136(d).

Affirmed.